UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
MOHAMMAD O. FAROQUE, et al.,

                Plaintiffs,

    - against -

PARK WEST EXECUTIVE SERVICES,
d/b/a TOWN CAR INTERNATIONAL,
et al.,

                Defendants.
------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
15 CV 6868 (DLI)

**POLLAK**, United States Magistrate Judge:

On December 2, 2015, plaintiff Mohammad O. Faroque ("Faroque")[1] commenced this

action individually and on behalf of all current and former similarly situated Drivers who had,

since December 2, 2009, provided driving services to defendants Park West Executive Services,

d/b/a Town Car International ("TCI"), Town Car International Holdings, LLC, Zachary Berman,

and John M. Ahern (collectively, "defendants"), alleging violations of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 201 et seq., the New York Labor Law § 650 et seq. ("NYLL"), and

the New York Code of Rules and Regulations ("NYCRR"), 12 N.Y.C.R.R. § 142-2.4, seeking

overtime and minimum wages, spread of hours wages, and wages earned in accordance with the

agreed upon terms of employment. (Compl.[2] ¶ 1). In addition, the Complaint alleged that

defendants took unlawful wage deductions and unlawfully retained gratuities, in violation of

---

[1]In addition to plaintiff Faroque, a number of other individuals filed consents to opt in as
plaintiffs prior to the filing of the Amended Complaint.

[2]Citations to "Compl." refer to the initial Complaint filed by Faroque on December 2,
2015.

NYLL §§ 193, 196-d.  (Id.)   Plaintiff proposed two subclasses of plaintiffs:  an FLSA collective action for claims under the FLSA and a class action for claims brought under the NYLL.  (Id. ¶¶ 2, 4).  The proposed FLSA subclass sought unpaid wages and other damages for the full FLSA statute of limitations period; the proposed NYLL subclass sought damages for the full NYLL statute of limitations period.  (Id.)

By Notice of Motion dated January 26, 2016, defendants moved, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), to compel arbitration and dismiss plaintiff Faroque's Complaint because he had entered into an agreement with defendants which obligated him to arbitrate any disputes.

Instead of responding to the Motion to Dismiss, plaintiffs filed an Amended Complaint on February 16, 2016, naming six additional plaintiffs:  Khaled Khan, MD Imranul Haque ("M. Haque"), Khandker Haque ("K. Haque"), Mohammed S. Alam, Asad Ikbal, and Mohammed E. Karim (collectively with Faroque, "plaintiffs").  In the Amended Complaint, plaintiffs allege that they were misclassified as independent contractors and were not paid all of the fees owed to them under their agreements with defendant TCI.  (Am. Compl.[3] ¶¶ 32-58).  Plaintiffs divide the class and collective claims between individuals who had agreements with defendants containing arbitration provisions and those whose agreements do not contain arbitration provisions.  (Id. ¶¶ 1-5, 115-116, 125-126).  For those whose agreements do not contain arbitration provisions, the proposed subclasses of plaintiffs seek damages for the full FLSA and NYLL statute of limitations periods.  (Id. ¶¶ 2, 3).  For those whose agreements contain arbitration provisions,

---

[3]Citations to "Am. Compl." refer to the Amended Complaint, filed on February 16, 2016. Although plaintiffs failed to file a proper motion to amend the Complaint, the district court permitted plaintiffs to file an Amended Complaint by Order, dated February 10, 2016.

plaintiffs propose additional subclasses for the FLSA and NYLL claims, seeking damages for the "period of time before entering into an agreement to arbitrate any claims." (Id. ¶ 4).

On March 4, 2016, defendants filed a Motion to Compel Arbitration as to plaintiffs Faroque and Ikbal, to dismiss the claims against the individual defendants, and to stay the claims of the remaining named plaintiffs pending the outcome of the arbitration. On June 16, 2016, the Honorable Chief Judge Dora L. Irizarry referred the Motion to the undersigned to prepare a Report and Recommendation.

For the reasons set forth below, it is respectfully recommended that defendants' motion to compel and motion to dismiss be denied and, even if the Court were to compel the arbitration of plaintiffs Faroque's and Ikbal's claims, that defendants' motion to stay the remaining plaintiffs' claims be denied.

FACTUAL BACKGROUND

A.  Plaintiffs' Allegations as to the Employment Relationship

Plaintiffs allege that defendant TCI is a "black car" transportation service, operating under contracts with various companies, including Christie's, JP Morgan Chase, and BNP Paribas, to provide transportation for their employees. (Id. ¶ 20). They allege that defendants Ahern and Berman are owners of TCI, and that Berman is its president. (Id. ¶¶ 16, 17). According to plaintiffs, TCI describes itself on its website as an "executive ground transportation" service and its drivers as "executive chauffeurs." (Id. ¶¶ 21, 25, 26; see Berman

Decl.[4] ¶ 3). Plaintiffs allege that they obtained the vehicles they drove based on defendants' specifications; the vehicles hold eight or fewer passengers. (Am. Compl. ¶¶ 27, 28).

Plaintiffs claim that during the class periods, defendants failed to pay members of the FLSA Collective and NYLL Class in accordance with federal and state wage and hour laws. (Id. ¶ 1). Specifically, plaintiffs allege that defendants agreed to pay plaintiffs and the other Drivers at the rate of 70% of the total amount a customer paid for a trip; in addition, the defendants took a 3% surcharge off of this 70% rate when the customer paid by a credit card, making the rate effectively 67%. (Id. ¶ 32). Plaintiffs claim that defendants did not pay plaintiffs the proper amount due, but rather defendants misrepresented to the Drivers the fare rates charged, such that the Drivers were paid a percentage of an artificially lowered total amount. (Id. ¶ 33). According to plaintiffs, defendants refuse to provide the Drivers with any "rate books" or other documentation to show the actual fares being charged to the clients so that the Drivers could determine if they were being properly compensated. (Id. ¶ 34).

Plaintiffs also complain that on the TCI website, defendants advertise that the quoted prices for rides include gratuities, but according to plaintiffs, TCI actually retains those amounts and fails to pay all or part of those gratuities to the Drivers. (Id. ¶¶ 35-37). Plaintiffs allege that defendants make other unlawful deductions from the Drivers' wages for unknown charges, labeled "TUC" and "IC Services," in amounts of $50 and $10 per week, respectfully. (Id. ¶ 38). There are also $1 to $2 processing fees allegedly taken from the Drivers' wages for each assignment, and amounts are also withheld if the Drivers are allegedly late or receive negative

_____

[4]Citations to "Berman Decl." refer to the Declaration of Zachary Berman, dated March 4, 2016.

4

customer reviews.  (Id. ¶¶ 39, 40).  The Amended Complaint further alleges that Drivers are required to purchase iPads (which they need to receive ride assignments); they are required to pay a weekly fee to use defendant TCI's app on their iPads and are forced to pay for the data charges incurred.  (Id. ¶¶ 43, 44, 45).  Plaintiffs allege that defendants also fail to reimburse Drivers for work-related expenses such as tolls and fuel costs, even though "fuel charges" are collected from customers.  (Id. ¶¶ 42, 46).

Plaintiffs allege that they log into defendant TCI's app and work "on the clock" on average between 70 and 80 hours per week, and that they work "off the clock" during time spent traveling to assigned locations, during inspections, waiting for customers, and washing and servicing the vehicles.  (Id. ¶¶ 47, 48).  The Amended Complaint alleges that not only do defendants fail to pay the Drivers minimum wages for the hours worked "off the clock," but they also fail to pay time and half for all hours worked over 40 in a workweek; they fail to pay wages in accordance with the agreements; and they fail to pay spread of hours pay on days when the plaintiffs worked more than 10 hours.  (Id. ¶ 31).  In addition to seeking these wages owed to them, plaintiffs also seek damages for the defendants' unlawful deductions.  (Id.)

B.  <u>Defendants' Claim of Independent Owner-Operator Status</u>

Defendants contend that TCI entered into an affiliation relationship with each independent owner-operator[5] of a vehicle.  (Berman Decl. ¶ 4; Defs.' Mem.[6] at 3; <u>see also</u> Am. Compl. ¶ 54).  Defendants state that Drivers are required to sign new agreements every 1-2 years.  (Berman Decl. ¶ 16).  According to defendants, each Driver is an independent contractor in business for himself, who provides skills and equipment that TCI does not own.  (Berman Decl. ¶ 6; Defs.' Mem. at 3).  Defendants contend that TCI is merely an "intermediary" between its corporate clients and the Drivers, each of whom enters into a separate contractual relationship with TCI based on the terms and conditions of an IOO Agreement. (Berman Decl. ¶ 6; Defs.' Mem. at 3).  Defendants claim that the Drivers are paid on a Form 1099 as independent contractors and that they are free to refuse to provide services to TCI clients at any time. (Berman Decl. ¶¶ 7, 8, 10; Defs.' Mem. at 3).  Indeed, defendants claim that the Drivers perform services to their own clients, free from the supervision and control of TCI.  (Berman Decl. ¶¶ 7, 8, 10; Defs.' Mem. at 3).  According to defendants, Drivers, including the named plaintiffs, determine their own hours of work, where they wish to work, and the services they provide. (Berman Decl. ¶ 9; Defs.' Mem. at 3).  Defendants concede that, as alleged by plaintiffs, each Driver is responsible for his own expenses, including gas, maintenance, insurance, tolls, and cell

_____

[5]Although defendants refer to the Drivers throughout their papers as "IOOs," the Court will refer to them as "Drivers" for consistency with the term used in the Amended Complaint. The term "IOO Agreement" refers to the Affiliated Independent Owner Operator Agreements entered into by plaintiffs with defendants.

[6]Citations to "Defs.' Mem." refer to the Memorandum of Law in Support of Defendants' Motion to Compel Arbitration, Dismiss the Individual Defendants, and Stay Any Remaining Claims, dated March 4, 2016.

phones. (Berman Decl. ¶ 11).

Plaintiffs claim that regardless of the labels applied by defendants, the Drivers were in fact employees, without whom TCI would be unable to exist. (Am. Compl. ¶¶ 57, 58). According to plaintiffs, the Drivers are subjected to numerous requirements, must undergo hours of training, are dispatched to their assignments, and are closely monitored through GPS tracking devices and frequent call-ins. (Id. ¶¶ 59-63). Plaintiffs allege that the Drivers are rated by a color-coded system and if they decline an assignment, they are penalized by having their iPads turned off for two hours, during which they do not receive additional assignments. (Id. ¶¶ 72-79, 80-81).

### C. The Arbitration Clause

Plaintiffs allege that plaintiff Faroque worked for TCI from approximately September 2014 until September 2015 (id. ¶ 9); plaintiff Ikbal worked from approximately 2010 until mid-2015 (id. ¶ 14); plaintiff Khan worked from approximately August 2003 until September 2013 (id. ¶ 10); plaintiff MD Imranul Haque worked from approximately December 2009 until November 2013 (id. ¶ 11); plaintiff Khandker Haque worked from approximately 2010 until 2014 (id. ¶ 12); plaintiff Alam worked from approximately early 2012 until early 2013 (id. ¶ 13); and plaintiff Karim worked from approximately April 2004 until October 2013. (Id. ¶ 15).

According to defendants, the IOO Agreements entered into by Faroque and the other Drivers set forth the method by which they would receive fees for services rendered to TCI clients, and include an express agreement that plaintiffs were operating as independent contractors. (Defs.' Mem. at 4; Berman Decl. ¶¶ 15, 16, Exs. A, B at 2, 3). In seeking to require

plaintiffs Faroque and Ikbal to arbitrate their claims, defendants contend that they entered into IOO Agreements with TCI in 2015 that contained specific clauses requiring disputes to be settled through arbitration. (Defs.' Mem. at 4). Specifically, defendants assert that Faroque entered into an IOO Agreement with TCI on February 17, 2015 (Berman Decl. ¶ 19, Ex. A), and Ikbal entered into a similar IOO Agreement with TCI on January 25, 2015 (id. ¶ 20, Ex. B (together with Exhibit A, the "2015 Agreements")), both of which contain an arbitration clause that provides: "[a]ll claims and disputes arising under or relating to this Agreement . . . are to be settled by individual binding arbitration in the state of New York, County of Queens." (Berman Decl. Exs. A, B ¶ 11(a)). The arbitration clause further provides that each party "shall pay its own litigation costs and attorneys' fees." (Id.)

Defendants contend that under the 2015 Agreements, the provision requiring arbitration survives termination of the Agreement and the Driver's affiliation with defendants. (Defs.' Mem. at 5). Defendants also take the position that because the 2015 Agreements entered into by Faroque and Ikbal do not contain any language limiting the application of the arbitration provision prospectively, the requirement to submit to arbitration applies to all disputes, whether or not they arose before or after the 2015 Agreements were entered into. (Id.)

Defendants also assert that the other plaintiffs signed IOO Agreements that are the same as the agreements entered into by Faroque and Ikbal, with the only exception being that the other agreements do not contain arbitration clauses. (Id.; Berman Decl., Exs. C-G). Those agreements also differ in that four of the five plaintiffs whose agreements have no arbitration clause signed

agreements that were expressly limited to a specific time period,[7] while the 2015 Agreements signed by plaintiffs Faroque and Ikbal contain no time limits.  (Compare Berman Decl., Exs. C, E, F, G, with id. Exs. A, B, D).

In the Amended Complaint, plaintiffs allege that the Drivers played no role in drafting the IOO Agreements, nor were they ever given a copy of their agreement or any explanation as to what they were being made to sign as a condition of their employment.  (Am. Compl. ¶ 56).  Indeed, although defendants were ordered by the Court on January 16, 2016 to produce all IOO Agreements signed by any of the opt-in plaintiffs, they did not produce an agreement for either Faroque or Ikbal prior to the 2015 Agreements.  (Pls.' Mem.[8] at 8 n.3).

None of the IOO Agreements that defendants did produce[9] for the remaining opt-in plaintiffs contained an arbitration provision.  (See Berman Decl., Exs. C-G).  Instead, each of these pre-2015 Agreements provided that any disputes would be brought in the appropriate state or federal court for the County of Queens, New York.  (Id.)  All but one of these pre-2015 Agreements was temporally limited.  (Id.; see supra note 7).  Since both Faroque and Ikbal were employed by TCI prior to the execution of the 2015 Agreements, plaintiffs assert that they had to have had prior IOO Agreements with TCI containing provisions similar to the agreements

_____

[7]Although plaintiff M. Haque's Agreement, dated April 29, 2013, does not contain an arbitration clause, the Agreement does have a space reserved for the term of the Agreement to be filled in.  (Berman Decl., Ex. D ¶ 1(a)).  However, the space was left blank and no dates were entered.  (Id.)

[8]Citations to "Pls.' Mem." refer to the Plaintiff's [sic] Memorandum of Law in Opposition to Motion to Compel Arbitration, Dismiss the Individual Defendants and Stay All Remaining Claims, dated March 21, 2016.

[9]Defendants produced agreements for each named plaintiff.  (See Berman Decl., Exs. A-G).  However, they only produced the 2015 Agreements for Faroque and Ikbal. (See id. Exs. A, B; Pls.' Mem. at 8 n.3).

produced for the other plaintiffs, which did not include arbitration provisions.[10] (Pls.' Mem. at 8 n.3). Plaintiffs argue, therefore, that the Court should presume that Faroque and Ikbal had prior agreements and that they included identical provisions to the remaining agreements produced by defendants. (Id.) Defendants, for their part, appear to concede that plaintiffs Faroque and Ikbal had prior IOO Agreements, notwithstanding their failure to produce such agreements, but they argue that, "the <u>current</u> and <u>operative</u> versions of their IOO Agreements, which contain the agreement to arbitrate all claims. . . " are the ones that govern this dispute. (Defs.' Reply[11] at 3) (emphasis added).


DISCUSSION

I. <u>Motion to Compel Arbitration</u>

    A. <u>Legal Standard</u>

As an initial matter, Faroque and Ikbal concede that any claims arising after the signing of the 2015 Agreements, which contain arbitration clauses, would be subject to arbitration, but it

---

[10]By defendants' own admission, plaintiff Faroque was affiliated with TCI beginning in November 2014, approximately three months before signing the 2015 Agreement that was produced and submitted to the Court. (See Berman Decl. ¶ 18, Ex. A). Defendants also do not dispute that plaintiff Ikbal was affiliated with TCI beginning in September 2011, over three years before signing the 2015 Agreement that has been provided to the Court. (See Berman Decl. ¶ 20, Ex. B). It is not plausible that neither Faroque or Ikbal had any prior IOO Agreements with TCI, particularly in light of the fact that the other plaintiffs' agreements were generally limited to terms of 12 to 24 months. (Id. ¶ 16, Exs. C, E, F, G). Indeed, if Faroque or Ikbal did provide services to TCI in the absence of IOO Agreements, that would undermine defendants' claim that these plaintiffs were independent contractors for the entirety of the period that they provided services to TCI.

[11]Citations to "Defs.' Reply" refers to the defendants' Reply Memorandum of Law in Support of Defendants' Motion to Compel Arbitration, Dismiss the Individual Defendants, and Stay Any Remaining Claims," dated March 31, 2016.

is clear from the Amended Complaint that Faroque and Ikbal only bring claims that arose prior to execution of their 2015 Agreements. (Am. Compl. ¶ 4; Pls.' Mem. at 8). Moreover, it is undisputed that none of the other plaintiffs have agreed to submit their claims to arbitration. (Defs.' Mem. at 5-6). Nonetheless, defendants seek an Order requiring Faroque and Ikbal to arbitrate all of their claims raised in this action, and ask the Court to stay the remaining plaintiffs' claims pending the outcome of the arbitration. (Defs.' Mem. at 8-18, 23-25).

The FAA provides that "[a] written provision . . . to settle by arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court and the Second Circuit have generally enforced agreements to arbitrate, noting that there is a strong federal policy in favor of promoting arbitration consistent with legislative intent. See AT&T Mobility v. Concepcion, 563 U.S. 333, 344-45 (2011); Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008); Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006). Based on this strong federal policy, a broad agreement to arbitrate creates a presumption of arbitrability which may only be overcome by "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 395 (2d Cir. 2015) (quoting Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d 88, 99 (2d Cir. 1999)). However, the FAA's "liberal policy in favor of arbitration is limited by the principle that 'arbitration is a matter of consent, not coercion. Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" Id. (alteration in original) (quoting JLM Indus. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004)).

Wage and hour claims pursuant to the FLSA and NYLL have been held to be subject to arbitration provisions on an individual basis.  See Raniere v. Citigroup Inc., 533 F. App'x 11, 14 (2d Cir. 2013) (compelling individual arbitration of FLSA and NYLL claims); Sutherland v. Ernst & Young LLP, 726 F.3d 290, 296-97 (2d Cir. 2013), appeal after remand, 600 F. App'x 6 (2d Cir. 2015) (enforcing agreement to arbitrate claims under the FLSA and NYLL on an individual basis).  Moreover, where there is a mandatory arbitration agreement involving claims under the FLSA, such agreements are valid despite the waiver of the plaintiffs' ability to bring a collective action.  See Sutherland v. Ernst & Young LLP, 726 F.3d at 296-97 (noting that "every Court of Appeals" has concluded that the FLSA does not preclude the waiver of collective action claims); see also Patterson v. Raymours Furniture Co., – F. App'x –, 2016 WL 4598542, at *2 (2d Cir. Sept. 2, 2016) (expressing concern as to the persuasiveness of Sutherland but reaffirming its holding).  But see Morris v. Ernst & Young, LLP, – F.3d –, 2016 WL 4433080, at *5 (9th Cir. Aug. 22, 2016) (holding that a collective action waiver in an arbitration clause was unenforceable in a claim brought under the FLSA); Lewis v. Epic Sys. Corp., 823 F.3d 1147, 1161 (7th Cir. 2016) (same).  Similarly, courts have held that NYLL claims are subject to arbitration on an individualized basis and an agreement to arbitrate will be enforced even if the rules burden the plaintiff's ability to bring a class action under state law.  See, e.g., Raniere v. Citigroup Inc., 533 F. App'x at 13-14; Sutherland v. Ernst & Young LLP, 726 F.3d at 298.

In determining whether there is an enforceable agreement to arbitrate, courts apply general principles of contract law, looking not only at whether the individual has acknowledged the terms of the written agreement, see David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 249 (2d Cir. 1991), but also at whether the individual continues to perform services

following notice of the obligation to arbitrate disputes.  See Brown v. Coca-Cola Enters., No. 08 CV 3233, 2009 WL 1146441, at *6-8 (E.D.N.Y. Apr. 28, 2009) (granting motion to compel arbitration despite absence of a signed arbitration agreement where plaintiff continued to work after receiving employee manual including arbitration provision).

Even when there is an enforceable agreement to submit to arbitration, courts must consider whether "the dispute at issue comes within the scope of the arbitration agreement."  In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011) (citing ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002)).  In determining whether a controversy falls within the scope of the agreement to arbitrate, the "correct approach is to assess whether the parties intended for the arbitration clause to cover the present dispute."  Holick v. Cellular Sales of New York, LLC, 802 F.3d at 398.  Courts must consider whether, based on the words used and the relationship of the parties, the parties intended an arbitration clause to apply retroactively.  Thus, although an agreement may not contain terms specifically limiting its application to future disputes, courts look to the intent of the parties to determine if the arbitration clause was intended to apply to disputes arising before the signing of the agreement.

B.  Analysis

As a threshold matter, it is undisputed that plaintiffs Faroque and Ikbal entered into agreements in 2015 that contained arbitration clauses.  It is equally undisputed that the other plaintiffs did not agree to submit their claims to arbitration.  Moreover, Faroque and Ikbal do not challenge the validity of the arbitration clauses in the 2015 Agreements, and they concede that

their claims that arose after they executed the 2015 Agreements would be subject to arbitration. (Pls.' Mem. at 8).

Plaintiffs do, however, dispute defendants' argument that the arbitration clauses in their 2015 Agreements should apply retroactively to claims that arose before the clauses were agreed to. (Id.) They contend that before 2015, defendants entered into numerous IOO Agreements with the plaintiffs that explicitly provided for dispute resolution in the appropriate state or federal court for the County of Queens, N.Y., and that these earlier agreements should control claims that arose at a time when those agreements were in effect. (Pls.' Mem. at 6-7, 8 n.3; Berman Decl. Exs. C-G). Since all of the plaintiffs, including Faroque and Ikbal, seek to bring wage and hour claims arising during time periods governed by the pre-2015 Agreements, they take the position that their claims are to be adjudicated in this Court. (Pls.' Mem. at 8-12). Thus, the question for this Court is whether the 2015 Agreements were intended by the parties to require Faroque and Ikbal to arbitrate all disputes, including those that arose prior to the agreement to arbitrate.

In arguing that the arbitration provisions were intended to apply only to claims arising after the signing of the 2015 Agreements, plaintiffs cite to the other plaintiffs' IOO Agreements entered into at various times in 2011, 2013, and 2014, each of which contained a governing law provision stating that, for all claims arising under "[t]his Agreement,"

> The courts of the County of Queens, State of New York, or the court of competent federal jurisdiction for the County of Queens, State of New York, shall have jurisdiction and venue of proceedings to enforce this Agreement and the parties agree that each such forum is acceptable and will not assert claims of forum non conveniens or attempt in any manner to deny jurisdiction or venue or to impede or thwart the

14

> enforcement of any judgment in any jurisdiction
> whatsoever.

(Berman Decl., Exs. C-G ¶ 11). The language in these earlier agreements is clear; all disputes are to be adjudicated in state or federal court in Queens, N.Y.

In addition, most of the versions of the pre-2015 Agreements also contain a provision limiting their duration. (See id. Exs. C, E, F, G ¶ 1(a); see also supra note 7). For example, one of the agreements provided to the Court was operative only from "April 2, 2011 and terminat[ed] February 28, 2013." (Id. Ex. G ¶ 1(a)). Similarly, a 2013 agreement provided to the Court contains the same clause with respect to jurisdiction and venue and also limited the terms of the agreement to "February 28, 2013 to February 28, 2015." (Id. Ex. C ¶ 1(a)).

Plaintiffs contend that it was not until the February 2015 version of the IOO Agreement that defendants first included an arbitration provision. (Pls.' Mem. at 7 (citing Berman Decl., Ex. A ¶ 11(a)). This new provision provides:

> (a) Arbitration. All claims and disputes arising
> under or relating to this Agreement . . . are to be
> settled by individual binding arbitration in the state
> of New York, County of Queens. The arbitration
> shall be conducted on a confidential basis pursuant
> to the Commercial Arbitration Rules of the American
> Arbitration Association.

(Berman Decl., Ex. A ¶ 11(a)) (emphasis added). Clearly, for those plaintiffs who had time-limiting and court resolution provisions in their IOO Agreements, there would be no requirement to submit their claims to arbitration. Although defendants have failed to produce any pre-2015 Agreements for Faroque and Ikbal despite being ordered to do so (see Pls.' Mem. at 8 n.3), according to defendant Berman, each Driver enters into an IOO Agreement with TCI (id. ¶ 5); Drivers are "typically required" to sign new agreements every 1-2 years (id. ¶ 16); and TCI

began incorporating arbitration clauses into its IOO Agreements in 2015. (Id. ¶ 15). As discussed supra note 10, it is not plausible that neither Faroque nor Ikbal worked for TCI prior to 2015 without an IOO Agreement, and since plaintiffs have asserted that the Drivers are not permitted to keep copies of their agreements, defendants alone would have copies. (Am. Compl. ¶ 56). Indeed, because defendants have not disputed plaintiffs' claim that Faroque and Ikbal's prior agreements were similar to those of the other plaintiffs (see Pls.' Mem. at 8 n.3; Defs.' Reply), it is both fair and safe to assume that the language in their pre-2015 Agreements demonstrates a clear intention for claims to be litigated in state or federal court. Thus, the Court must consider whether the parties intended the newly introduced arbitration clauses to apply retrospectively to claims which, under the pre-2015 Agreements, were subject to resolution in state or federal court.

In arguing that the arbitration clauses should be applied retroactively, defendants rely on the court's statement in Reid v. Supershuttle International, Inc. that "arbitration clauses without an express limitation to 'future disputes' should be applied to any preexisting claims." No. 08 CV 4854, 2010 WL 1049613, at *5-6 (E.D.N.Y. Mar. 22, 2010) (citing Coenen v. R.W. Pressprich & Co., 453 F.3d 1209, 1212 (2d Cir. 1972); Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d at 99). In Reid, this Court was presented with circumstances similar to those at issue here, where some of the plaintiffs' contracts contained arbitration provisions, while others did not. 2010 WL 1049613, at *1. In objecting to defendants' motion to compel arbitration of the claims brought only by plaintiffs whose contracts contained the arbitration clauses, plaintiffs argued that: 1) the arbitration provision was unconscionable; 2) the class action waiver was unenforceable; and 3) the arbitration clause should be limited to the

claims arising before the arbitration agreement was entered into because there was "no temporal limitation" to the provision.  Id. at *2.  Although the Court did not provide details as to the language of the agreements, the Court held that the parties intended the arbitration clause to apply retroactively because the parties had not expressly indicated an intention to apply the arbitration provision only to future claims.  Id. at *5-6.

Reid, however, was decided prior to the decision in Holick v. Cellular Sales of New York, LLC, where the Second Circuit expressly disavowed this broad rule, and instead emphasized that "the correct approach is to assess whether the parties intended for the arbitration clause to cover the present dispute."  802 F.3d at 397-98.  In Holick, there was an initial agreement between the parties that provided for an independent contractor relationship but did not contain an arbitration clause.  Id. at 393.  When a later agreement was entered into providing for an employment relationship and adding an arbitration clause, the Second Circuit rejected defendants' attempt to compel the arbitration of claims that arose under the earlier agreement, finding "positive assurance that the arbitration clause's scope . . . is temporally limited."  Id. at 398.  The court found that the transformation of the legal relationship between the parties was evidence that the parties did not intend the arbitration clause to apply retroactively, because the arbitration clause only applied to disputes "arising out of, or in relation to Employee's employment," and the parties' initial agreement demonstrated that they did not believe plaintiffs were employees.  Id.

In this case, the 2015 Agreements themselves provide no indication that the parties intended the agreements to apply retroactively.  See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010) (citations omitted) (noting that the "primary" purpose of the

FAA is "to ensure that 'private agreements to arbitrate are enforced according to their terms'"). While the 2015 Agreements contain no specific reference to retroactivity (Berman Decl., Exs. A, B), defendants argue that "any prior IOO Agreements signed by the parties are no longer valid or enforceable, i.e., the current IOO Agreement stands in the shoes of the prior one." (Defs.' Reply at 3). In support of this argument, they rely on language in the 2015 Agreements providing that "any and all prior agreements . . . are hereby terminated and canceled in their entirety and are of no further force and effect." (Id. (quoting Berman Decl., Exs. A, B ¶ 10(a))).

The problem with defendants' argument is that assuming Faroque's and Ikbal's prior agreements had defined termination dates (see supra at 15-16 & note 10), those agreements had already expired as of the time the new 2015 Agreements were executed and thus the 2015 Agreements established entirely new relationships between the parties. Prior to the 2015 Agreements, the parties' practice was to enter into a new IOO Agreement every one to two years. (See, e.g., Berman Decl. ¶ 16, Ex. C ¶ 1(a); see also supra at 15). While the parties could have chosen to extend or amend those prior contracts with appropriate modifications, defendants required plaintiffs to execute brand new agreements at the expiration of the two-year period. Thus, each agreement appears to be a separate contract, not a modification of a prior one. Accordingly, the language in the 2015 Agreements, stating that prior agreements are canceled, is superfluous because by their very terms, the prior agreements had expired at the end of their terms.

Moreover, as in Holick, the arbitration provision in the 2015 Agreements expressly applies only to disputes "arising under or relating to this Agreement." (Id. Exs. A, B ¶ 11(a)) (emphasis added). Any claim that plaintiffs were improperly paid prior to the execution of the

2015 Agreements clearly did not "arise under" the 2015 Agreement; such claims arose under the earlier agreements, which contained specific non-arbitration means of dispute resolution. The earlier agreements clearly provided that federal or state courts for the County of Queens, New York, would have jurisdiction over "[those] Agreement[s], and all questions arising in connection" with them. (Id. Exs. C-G ¶ 11).

Moreover, had the parties intended to extend the arbitration provision to cover all claims, even those arising prior to the 2015 Agreements, they would not have limited the arbitration clause to claims relating to "this" agreement; they could have provided that all claims relating to "this and any prior" agreements be subject to arbitration, or they could simply have said, as in Arrigo v. Blue Fish Commodities, Inc., that the arbitration provision applied to any claims arising at any time during the parties' relationship, rather than limiting it to "this Agreement." See 408 F. App'x 480, 482 (2d Cir. 2011) (finding that a clause providing for arbitration for "any . . . basis of action pertaining to [Arrigo's] employment" applied retroactively because the use of the term "employment" rather than "this agreement" demonstrated an intent to apply the clause to the parties' entire employment relationship and not just to the period after the agreement took effect).

Since plaintiffs Faroque and Ikbal only seek to bring claims that arose prior to the execution of their 2015 Agreements, those claims arose "in connection with" the earlier agreements and thus were subject to resolution in federal or state court. (Am. Compl. ¶ 4; Pls.' Mem. at 8). In agreeing to the earlier contracts, the parties clearly contemplated how to resolve disputes and chose a mechanism that did not require arbitration. While defendants argue that the Second Circuit's decision in Holick is distinguishable because there, "[t]he claims related

exclusively to the parties' prior legal relationship" and "the dispute had to be resolved with reference to the old agreements," those circumstances are present here, as well. (Defs.' Reply at 4 (citing Holick v. Cellular Sales of New York, LLC, 802 F.3d at 397-98)). As in Holick, here, "[t]his dispute is about events that transpired when the [prior] Agreements were in effect, and these contracts have their own dispute resolution mechanism." Holick v. Cellular Sales of New York, LLC, 802 F.3d at 399.

In the absence of specific language in the arbitration clauses indicating that the parties intended that all issues, even those arising under a prior agreement, would be subjected to arbitration, the Court concludes that the parties did not intend the provisions to apply retroactively to claims that arose when their prior agreements were still operative.

Accordingly, the Court respectfully recommends that defendants' motion to compel arbitration of Faroque's and Ikbal's claims be denied.

## II. Motion to Dismiss

Defendants have also moved to dismiss plaintiffs' claims against the individual defendants, on the grounds that: 1) plaintiffs Faroque's and Ikbal's claims were improperly filed in this Court and are subject to arbitration; and 2) plaintiffs have not pleaded sufficient facts to hold the individual defendants liable under either the FLSA or NYLL. (Defs.' Mem. at 19-22). Since the Court has determined that the arbitration clauses in Faroque's and Ikbal's 2015 Agreements were not intended to apply to their pre-2015 claims, the Court respectfully recommends that defendants' motion to dismiss on the ground that plaintiffs' claims against the individual defendants are subject to arbitration be denied. The Court now addresses whether

plaintiffs have sufficiently stated a claim against the individual defendants under the FLSA and NYLL.

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice. Id.; see also Bell Atl. Corp. v. Twombly, 550 U.S. at 555. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct" and the plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. Ashcroft v. Iqbal, 556 U.S. at 679. However, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013).

The Second Circuit has stated that, in deciding a Rule 12(b)(6) motion, a court must "accept[] as true the factual allegations of the complaint and draw all inferences in the plaintiff's favor." Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015); see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Gorman v.

Consolidated Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007); Hernandez v. Coughlin, 18 F.3d

133, 136 (2d Cir.), cert. denied, 513 U.S. 836 (1994).  In making this determination, a plaintiff's

claims "must be construed liberally."  Hitchins v. New York City Dept. of Educ., No. 11 CV 4180,

2013 WL 1290981, at *3 (E.D.N.Y. Mar. 25, 2013).  However, the court is not required to accept

the truth of legal conclusions couched as factual allegations.  See Papasan v. Allain, 478 U.S. 265,

286 (1986).

The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief."  Allen v.

WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (quoting Conley v. Gibson, 355 U.S. 41,

45-46 (1957)); accord Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997) (holding that after

construing plaintiffs' claims liberally, a court may grant dismissal "only if it is clear that the

plaintiff would not be entitled to relief under any set of facts that could be proved consistent with

the allegations"); Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996), cert.

denied, 520 U.S. 1264 (1997).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims."  Villager Pond, Inc. v.

Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (internal quotations omitted), cert. denied, 519

U.S. 808 (1996).

Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in

the interest of an employer in relation to an employee . . . . "  29 U.S.C. § 203(d).  "Person" is

defined as "an individual, partnership, association, corporation, business trust, legal

representative, or any organized group of persons."  Id. § 203(a).  To "employ" means "to suffer

or permit to work."  Id. § 203(g).  An individual may be liable as an employer under the FLSA

so long as he exercises "operational control" over the employee in question, see Irizarry v.

Catsimatidis, 722 F.3d 99, 110 (2d Cir. 2013), and individuals who are found to be "employers" under the FLSA may be held jointly and severally liable to the plaintiff. Moon v. Kwon, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002).

Under the NYLL, an "employer" is defined as "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." N.Y. Lab. L. §§ 190(3), 651(6). Courts in this circuit have interpreted this definition coextensively with that of the FLSA. See, e.g., Chen v. Kaijou Rest., No. 13 CV 8968, 2016 WL 270870, at *2 (S.D.N.Y. Jan. 21, 2016). Similarly, an employee is simply defined as "any individual employed or permitted to work by an employer in any occupation." N.Y. Lab. L. § 651(5). In making these determinations, New York courts focus on the degree of control the alleged employer exercised over the alleged employee. See Fermin v. Las Delicias Peruanas Rest., Inc., 93 F. Supp. 3d 19, 34 (E.D.N.Y. 2015); see also Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 695, 802 N.E.2d 1090, 1095 (N.Y. 2003).

Defendants argue that the only two paragraphs that specifically mention the individual defendants are insufficient to state a claim under either statute. (Defs.' Mem. at 22 (citing Am. Compl. ¶¶ 16, 17)). Those paragraphs allege that defendant Berman is the President and an owner of defendant TCI, and that defendant Ahern is an owner of defendant TCI. (Am. Compl. ¶¶ 16, 17). The Amended Complaint further alleges that both individual defendants "exercise[ ] sufficient control of the operations of TCI and in determinating the policies and practices of TCI, including, but not limited to, how employees, including Drivers, are compensated and perform their work, to be considered Plaintiffs' employer under all applicable statutes." (Id.) Defendants argue that these allegations are "mere labels and conclusions" and that more specific facts are

required in order to survive a motion to dismiss. (Defs.' Mem. at 22 (citing <u>Spataro v.</u> <u>Government Emp'rs Ins. Co.</u>, No. 13 CV 5020, 2014 WL 3890222, at *4 (E.D.N.Y. Aug. 6, 2014))).

Plaintiffs respond that, because the allegations in the Amended Complaint refer to defendants collectively as "defendants," additional allegations in the Amended Complaint are stated equally as to the individual defendants as they are to defendant TCI, and that those allegations are sufficient to state a claim under both the FLSA and NYLL. (Pls.' Mem. at 14). Specifically, plaintiffs claim that they have alleged that the individual defendants "had and have the power to hire and fire employees, control schedules and conditions of employment, and determine the rate and method of payment." (<u>Id.</u> at 14-15 (citing Am. Compl. ¶¶ 29-31, 32-33, 54-55, 61-72, 90, 99-110)). Plaintiffs argue that these allegations sufficiently allege the individual defendants' liability. (<u>Id.</u> at 15 (citing cases)).

The Court agrees with plaintiffs that the allegations in the Amended Complaint sufficiently state facts which, if accepted as true, would establish that the individual defendants had "operational control" over plaintiffs. <u>Irizarry v. Catsimatidis</u>, 722 F.3d at 110. Specifically, plaintiffs have alleged that the individual defendants determine how employees are compensated and how they perform their work. (Am. Compl. ¶¶ 16, 17). For example, the individual defendants allegedly dispatch Drivers to assignments (<u>id.</u> ¶ 61), monitor Drivers through GPS tracking and require the Drivers to check in with them periodically (<u>id.</u> ¶ 63), scrutinize and interrogate Drivers who turn off their iPads during the workday (<u>id.</u> ¶ 71), are able to "black out" or withhold certain assignments from Drivers (<u>id.</u> ¶ 83), inspect Drivers' cars at random (<u>id.</u> ¶ 92), and prohibit Drivers from asking for tips, negotiating fares with clients, giving their

personal phone numbers to client, driving clients when they are off the clock, working for other black car or taxi companies, and soliciting or advertising their own services to clients.  (Id. ¶¶ 101-106).

Accepting these allegations as true, plaintiffs have sufficiently alleged that the individual defendants exercise "operational control" over plaintiffs.  Cf. Suggs v. Crosslands Transp., Inc., No. 13 CV 6731, 2015 WL 1443221, at *5 (E.D.N.Y. Mar. 27, 2015) (holding that allegations that an individual defendant had a "high degree of direction and control of [plaintiff's] work," assigned work hours, dictated plaintiff's compensation, and directed "which customers he should transport and the rates he could charge" sufficiently stated a claim for individual liability under the FLSA).  While defendants have raised the defense that plaintiffs were not employees but rather were independent contractors not subject to the wage and hour laws (see Defs.' Mem. at 1, 3-6; Berman Decl. ¶¶ 4-16), that is an issue of fact to be further explored during discovery.  The issue before this Court is simply whether the Amended Complaint adequately alleges that the individual defendants were "employers."  The Court finds that it does.

Based on the totality of the allegations in the Amended Complaint, the Court respectfully recommends that defendants' motion to dismiss the claims against the individual defendants be denied.

III.  Motion to Stay

Defendants have requested that the Court enter a stay of the remainder of the class and collective claims until the claims of plaintiffs Faroque and Ikbal have been decided by an arbitrator.  Although this Court has recommended that the claims not be sent to arbitration, even

if the Court were to disagree and determine that Faroque's and Ikbal's claims were subject to arbitration, it is respectfully recommended that the claims of the remaining plaintiffs be allowed to proceed in this Court in accordance with the agreements that those plaintiffs entered into with defendants. Nothing in their agreements indicated an intention to submit their disputes to an arbitrator and, in fact, their agreements explicitly provide that their disputes are to be presented to state or federal court in Queens, N.Y. (See, e.g., Berman Decl., Ex. C ¶ 11 (providing that "the parties agree that [the appropriate state or federal] forum is acceptable and will not . . . attempt in any manner to deny jurisdiction or venue or to impede or thwart the enforcement of any judgment in any jurisdiction whatsoever")).

Accordingly, it is respectfully recommended that defendants' motion to compel arbitration and stay all class claims pending the arbitration of Faroque's and Ikbal's claims be denied.

CONCLUSION

In light of the foregoing, the Court respectfully recommends that defendants' motion to compel arbitration of plaintiffs Faroque's and Ikbal's claims and motion to dismiss plaintiffs' claims against the individual defendants be denied. Moreover, if defendants' motion to compel arbitration is granted, the Court respectfully recommends that defendants' motion to stay the remaining plaintiffs' claims pending the outcome of Faroque and Ikbal's arbitration be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
      September 7, 2016

/s/Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York